UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAWRENCE G. VARDON,

       Plaintiff,

                                    Civil Case No. 16-11807

v.                                   Honorable Linda V. Parker

FCA US LLC,

       Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Lawrence G. Vardon ("Plaintiff") filed this lawsuit against his employer, Defendant FCA US LLC ("Defendant" or "FCA"), claiming disability discrimination and harassment in violation of federal and state law. The matter is presently before the Court on Defendant's motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56. (ECF No. 29.) The motion has been fully briefed. (ECF Nos. 31, 33.) Finding the facts and legal arguments sufficiently developed in the parties' briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f). For the reasons set forth below, the Court is granting in part and denying in part Defendant's motion.

## I.    Factual and Procedural Background

Plaintiff is deaf and has been since he was a year old.  Plaintiff's primary and preferred language is American Sign Language ("ASL").  "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages." *EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1105 (9th Cir. 2010) (citing cases).  "In many cases, there is no one-to-one correspondence between signs in ASL and words in the English language." *Id*.

Plaintiff can read and read lips.  However, Plaintiff's ability to read lips is variable and depends on context.  (Pl.'s Resp. Br., Ex. 1 at 73-74, ECF No. 31-1 at Pg ID 590-91.)  In controlled ideal testing conditions, Plaintiff is able to discern through lip reading at best 41% of what someone says to him.  Further, Plaintiff reads and writes at a first- to second-grade level.  (*Id*. at 74-75, Pg ID 591-92.)

Plaintiff began working at FCA in October 1995.  Initially, Plaintiff worked as a Production Operator at FCA's Sterling Stamping plant.  Throughout his employment, Plaintiff has been a member of the United Automobile Workers ("UAW" or "union"), and subject to the terms of the Collective Bargaining Agreement between the UAW and FCA.

In 2010, Plaintiff was promoted to the position of Metal Finisher at the Sterling Stamping plant.  He remains in that position today.  Metal Finishers are

responsible for buffing, polishing, and correcting imperfections in the metal parts before they are sent to the assembly plants. This work is largely independent—a hi-lo driver brings a rack of parts to the metal finishing area and the Metal Finishers retrieve the parts, correct any imperfections, and place the finished parts back on the rack. The metal finishing area is only a few feet from multiple stamping presses, which are so loud that employees are required to wear proper ear protection.

There is no dispute that Plaintiff performs his job as a Metal Finisher well. He also is liked by his supervisors and co-workers. They communicate with Plaintiff through text messages, hand-written notes, type-written notes, lip-reading, visual aids, demonstrations, and gestures. Plaintiff's bench partner, Michael Stewart, has a deaf brother and knows how to finger spell "a little bit." (Def.'s Mot., Ex. 21 at 19, ECF No. 30-1 at Pg ID 231.)

Plaintiff requires sign language interpreters to understand and participate in group meetings, other lengthy or important workplace meetings, and trainings. (Pl.'s Mot., Ex. 1 at 90, ECF No. 31-1 at Pg ID 607.) Without an interpreter, he does not understand what is being said and cannot ask questions. (Def.'s Mot., Ex. 21 at 123-25, ECF No. 30-1 at Pg ID 123-25.) While Plaintiff is aware that Defendant posts policies and information throughout the plant, he testified that he

cannot understand what is written on the posters because the English is too complicated.  (*Id*. at 83-84.)

According to Lori Otis, who was Defendant's Human Resources Manager at the Sterling Stamping plant during the relevant time period, Defendant's accommodation process requires a person needing an accommodation to make a request through their supervisor or, for union employees, through their union official or steward.  (Def.'s Mot., Ex. 23 at 9, 11, ECF No. 30-3 at Pg ID 411.)  When asked if he requested an accommodation from Defendant, Plaintiff replied: "I can't go directly to the answer person, but I go through the steward, but I'm continually denied."  (*Id*., Ex. 21 at 130, ECF No. 30-1 at Pg ID 342.)  When a request is made, Otis provided that the standard procedure is for the supervisor or union employee to bring the request to HR for review.  (*Id*., Ex. 23 at 11-12, ECF No. 30-3 at Pg ID 411.)  Otis indicated that an employee also can bring the request directly to HR or the labor group.  (*Id*.)

Plaintiff testified that he repeatedly requested sign language interpreters from his supervisors and managers at FCA.  (Def.'s Mot., Ex. 21 at 12-16, 85, 87, 100-05, 129-30, 136; ECF No. 30-1 at Pg ID 224-28, 297, 312-17, 341-42, 348; *see also* Def.'s Mot., Ex. 13, ECF No. 29-14.)  Plaintiff further testified that his requests were routinely ignored.  (*Id*.)  He made his first request in 1995, shortly after he was hired.  (*Id*. at 85, Pg ID, 297.)  According to Plaintiff, the union

steward threw him out of his office when he asked and human resources got mad at him.  (*Id.* at 84-85, Pg ID 296-97.)

In 2009, Plaintiff requested an interpreter to participate in a one-week metal finishing class and did not receive one.[1]  (*Id.* at 93-99, Pg ID 305-11; Pl's Resp. Ex. 3 at 4, ECF No. 31-3 at Pg ID 613.)  In the summer of 2012, Plaintiff requested an interpreter from his supervisor Pat Murph for an on-site training on how to use tools Defendant recently purchased from a vendor.  (Def.'s Mot., Ex. 21 at 100-05, ECF No. 30-1 at Pg ID 312-17.)  When no interpreter was provided, Plaintiff refused to go to the training.  (*Id.*)  According to Plaintiff, Murph mocked him for not attending the tools class, making gestures suggesting she was calling Plaintiff a "cry baby."  (*Id.* at 104-05, Pg ID 315-16.)

After the training, the instructor visited Plaintiff's work station to demonstrate how to use the new tools.  (*Id.* at 106-07, Pg ID 318-19.)  Plaintiff testified that the instructor showed him "[a] little bit" and that he understood how to use the tools only "[a] little bit" because the communication with the instructor was not good.  (*Id.*)

---

[1] While this incident may be outside the applicable three-year limitations period, *see* 42 U.S.C. §§ 2000e-5, 12117(a), the Court finds it relevant to assess Defendant's notice of Plaintiff's need for an accommodation.

Plaintiff also testified that he told two of his union stewards and a supervisor named Joe about Video Remote Interpreting ("VRI")[2] and asked through them that Defendant provide him with VRI for shorter meetings. (Def.'s Mot., Ex. 21 at 129-36, 179, ECF No. 30-1 at Pg ID 342-48, 385.) During his deposition, Plaintiff described the struggle of explaining VRI to his steward, Lara Hagle: "I told them about the VRI, and she didn't even know what I was talking about. Again, we need an interpreter just to get a simple question. Trying to struggle through notes and trying to explain all of this with just gestures." (*Id.*at 131, Pg ID 343.) Plaintiff testified that his request was denied. (*Id.* at 130, 132, Pg ID 342, 344.)

On December 14, 2012, Plaintiff submitted an Intake Questionnaire to the United States Equal Employment Opportunity Commission ("EEOC") claiming disability discrimination.[3] (Pl.'s Resp., Ex. 3 at PLA220, ECF No. 31-3 at Pg ID 829.) Plaintiff described that he was not provided interpreters for training and did

---

[2] Video Remote Interpreting is "an interpreting service that uses video conference technology over dedicated lines or wireless technology offering high-speed, wide-bandwidth video connection that delivers high-quality video images." 28 C.F.R. § 36.104. As Plaintiff understood the technology and explained it during his deposition, a remote interpreter is accessed visually and audibly via the service who then can receive sign language messages from one party and verbally convey the message to the other party. (Def.'s Mot., Ex. 21 at Pg ID 133, ECF No. 30-1 at Pg ID 345.)

[3] Plaintiff received assistance in completing this and other EEOC paperwork from a social services agency for the deaf. (*See* Pl.'s Resp., Ex. 3 at PLA211, ECF No. 31-3 at Pg ID 820.)

not have the same access to communication that his hearing co-workers have.[4]

(*Id*.)  On February 5, 2013, Plaintiff filed a Charge of Discrimination with the

EEOC and Michigan Department of Civil Rights.  (*Id*. at PLA209-211, Pg ID 818-

20.)

In 2013, Plaintiff's request for an accommodation came to the attention of

Defendant's human resources manager, Lori Otis.[5]  (Def.'s Mot., Ex. 23 at 16, Pg

ID 30-3 at Pg ID 412.)  Otis emailed Plaintiff's union steward, Charles "Chuck"

Williams, to arrange a meeting to discuss Plaintiff's request.  (*Id*.; *see also* Def.'s

Mot., Ex. 7, ECF No. 29-8.)  Williams responded, indicating that he was not sure

how productive the meeting would be unless Otis is a translator.  (Def.'s Mot., Ex.

7 at 3, Pg ID 29-8 at Pg ID 151.)  Otis communicated that the "plan of

communication is written word."  (*Id.*)  Plaintiff told Williams he did not want to

meet with Otis if there was no interpreter because he did not know how he was

going to communicate with her and "writing is useless."  (Def.'s Mot., Ex. 21 at

151, ECF No. 30-1 at Pg ID 363.)  Williams then sent Otis an email, stating:

---

[4] It appears that Plaintiff submitted the questionnaire after being terminated for not following Defendant's call-in procedures for sick leave.  The incident, including Plaintiff's subsequent reinstatement with backpay and benefits, is described in detail in the parties' briefs.  Nevertheless, the Court finds it unnecessary to relate the incident here for purposes of deciding Defendant's summary judgment motion.
[5] The record does not reflect how Otis became aware of Plaintiff's request for an accommodation.  She testified that she was unaware of the EEOC charge prior to 2015.  (Def.'s Mot., Ex. 23 at 21-22, ECF No. 30-3 at Pg ID 414.)

I just finished communicating with Mr. Larry Vardon, he said there isn't a need to meet with you at this point in time. He also (texted) stated that if you had an interpreter he would speak with you just in general, but there isn't any pressing issues at this point in time.

(Def.'s Mot., Ex. 7 at 3, ECF No. 29-8 at Pg ID 156.)

On March 16, 2014, Williams sent an email to Otis requesting an interpreter for Plaintiff for "big events", like Town Hall meetings, personnel trainings, and classes. (Def.'s Mot., Ex. 8, ECF No. 29-9 at Pg ID 159.) Williams also conveyed that Plaintiff requested internet access so he can communicate via an iPad. (*Id*.) The following day, Plaintiff met with Otis, union steward Lara Hagle, Plaintiff's new supervisor Jill Reed, and Jeff Smith from Defendant's labor department. (*Id*., Ex. 21 at 153-54, ECF No. 30-1 at Pg ID 365-66.) Plaintiff asked for an interpreter for the meeting, but was told that there was no time to call one and was forced to communicate by writing notes and attempting to lip read. (*Id*. at 155, Pg ID 367.) Plaintiff was very nervous as he was worried he "was going to be suspended or fired" and described the meeting as a "traumatic event." (*Id*.) In contrast, Otis testified that she thought the meeting was informal and cooperative. (Def.'s Mot., Ex. 23 at 18-19, ECF No. 30-3 at Pg ID 413.)

The written communication from the meeting reflects that Otis agreed to provide an interpreter for Plaintiff at Town Hall meetings and trainings. (Def.'s Mot., Ex. 9, ECF No. 29-10.) Further, Plaintiff's supervisor, Reed, agreed to write down instructions and information for Plaintiff from safety meetings. (*Id*.)

Plaintiff's request for internet access and an iPad was not addressed.  However, when asked: "Are we good? Anything else?"  Plaintiff responded: "Yes I think so." (*Id*.)

The record reflects that Defendant provided an interpreter for Plaintiff at Town Hall meetings on June 18, 2014 and February 16, 2015, safety awareness trainings on July 28, 2014 and June 29, 2016, and a workplace organizational meeting on July 29, 2014.  (*See* Def.'s Mot., Ex. 21 at 185-89, ECF No. 30-1 at Pg ID 386-87.)  Plaintiff testified that otherwise "it was the same old thing where … there was [sic] meetings, everyone was just writing notes, and you know, there was new management and different supervisors and more turnover."  (*Id*. at 164-65, Pg ID 376-77.)  In other words, "thereafter nothing happened."  (*Id*. at 165, Pg ID 377.)  According to Plaintiff, his supervisor Jill never wrote notes for him like she promised at the March 17, 2014 meeting.  (*Id*. 164, Pg ID 376.)

On November 17, 2014, Area Manager Wendell Bates conducted a meeting with the Metal Finishers.  (Def.'s Mot., Ex. 16, ECF No. 29-17.)  Plaintiff refused to attend because an interpreter was not provided and the union filed a grievance because an interpreter was not hired.  (*Id*.)  At Step 1, management responded that it was an impromptu meeting, thus there was no time to hire an interpreter.  (*Id*.)  Management further responded that they have communicated with Plaintiff without an interpreter in the past.  (*Id*.)  The response at Step 2 was that there was no

contractual violation, management had communicated with Plaintiff in the past without an interpreter, and that not attending a mandatory meeting was not the proper way for Plaintiff to request an accommodation. (*Id.*)

In the meantime, on Friday, August 1, 2014, Otis received two text messages from Plaintiff's union stating that Plaintiff had contacted them about being bullied by one of his co-workers, Donna Sweatt. (Def.'s Mot., Ex. 12, ECF No. 29-13.) When Plaintiff arrived at work, Otis asked him to come to HR so she could obtain more information and determine whether there was a threat of violence requiring immediate action. (*Id.*, Ex. 23 at 61-63, ECF No. 30-3 at Pg ID 424.)

Plaintiff reported to HR with his union steward, Hagle. In writing, Otis informed Plaintiff she was investigating his allegation of being harassed or bullied and requested that he write a statement. (*Id.*, Ex. 12 at DEF39, ECF No. 29-13 at Pg ID 179; Ex. 13, ECF No. 29-14.) Plaintiff refused to provide a written statement, explaining: "Sorry I need an interpreter for my skill sign lang. not good write English sorry. I go back to work." (*Id.*, Ex. 13.) Otis wrote back: "You write fine. I can understand. Please try. We need to know what has happened ASAP. We can not [sic] wait for an interpreter." (*Id.*) Plaintiff refused, stating: "I am not good today and my nervous [sic] break down." (*Id.*)

Otis went on to interview Sweatt and another Metal Finisher, Gordy Griffin, who was talking with Sweatt when the alleged interaction between Sweatt and

Plaintiff occurred.  (*Id*., Ex. 12 at DEF39-40, ECF No. 29-13 at Pg ID 179-80.)

According to Sweatt, Plaintiff was getting hit hard with repairs and she felt sorry

for him.  (*Id*.)  Sweatt and Griffin were talking about Plaintiff having to work so

hard when Plaintiff looked at Sweatt, raised his two middle fingers, and said

"f--- you Bitch."  (*Id*.)  Sweatt thought Plaintiff was joking and said "f--- you"

back."  (*Id*.)  Sweatt was upset when Otis told her Plaintiff accused Sweatt of

bullying, indicating that she had been friends with Plaintiff and his family for

years.  (*Id*.)

Otis next interviewed Griffin who provided that Plaintiff was getting behind

on his work and was getting frustrated.  (*Id*. at DEF40, Pg ID 180.)  Griffin

indicated that Sweatt walked over to Plaintiff's area and Plaintiff then flipped her

off, yelling "f--- you."  (*Id*.)  Sweatt said it back.  (*Id*.)  Griffin told Otis that he did

not hear any threats and did not see Sweatt signing anything to Plaintiff.  (*Id*.)

Griffin told Otis that Sweatt "has been in Larry's corner."  (*Id*.)

Otis ultimately concluded that without Plaintiff's cooperation, "the evidence

uncovered no evidence or witness statements supporting the allegations of bullying

or threats …."  (*Id*. at DEF48, Pg ID 185.)

The UAW filed a grievance on Plaintiff's behalf because an interpreter was

not provided for him to make a statement regarding the incident with Sweatt or

during his meeting with Human Resources about the incident.  (Def.'s Mot., Ex.

15, ECF No. 29-16.)  Defendant answered at Step 1, stating that there was no contractual violation and that in a previous meeting between Plaintiff and Otis, Plaintiff did not need an interpreter and was able to express his concerns and communicate through writing.  (*Id*.)  Eventually the grievance was resolved with Defendant agreeing to provide Plaintiff with an interpreter "upon request within advance reasonable time."  (*Id*. at DEF71, Pg ID 195.)

 After a lengthy process, the EEOC concluded its investigation of Plaintiff's complaint on or about January 20, 2016.  (Pl.'s Resp., Ex. 3 at PLA385, ECF No. 31-3 at Pg ID 994.)  The EEOC issued a Notice of Right to Sue on February 22, 2016.  (*Id*. at PLA393, Pg ID 1002.)  Plaintiff commenced this lawsuit on May 20, 2016.

On August 23, 2017—the day before Defendant filed the pending motion for summary judgment—Defendant held another meeting with Plaintiff to discuss his accommodation requests.  According to Defendant, an interpreter was present at the meeting.  (Def.'s Br. in Supp. of Mot. at 18, ECF No. 29 at Pg ID 121.)  Plaintiff asserts that he was made to sign a document at the meeting, identifying accommodations Defendant would provide him.  (Pl.'s Resp. Br. at 7, ECF No. 31 at Pg ID 498.)

According to this document, Defendant "committed to providing" Video Remote Interpreting ("VRI") software on a laptop with internet access for Plaintiff

to use "during any business interactions during the working day."  (Def.'s Mot., Ex. 20, ECF No. 29-21.)  Defendant also agreed to provide a live ASL interpreter for meetings that are: (a) scheduled for greater than 30 minutes, (b) scheduled at least one week in advance, and (c) "a range of vision across an area larger than a conference room is necessary to provide interpretation services."  (*Id*.)  Defendant further agreed to provide an interpreter for any computer training which has spoken word and no closed captioned option.  (*Id*.)  Lastly, Defendant agreed to provide closed captioning on a television or monitor if material displayed contains spoken word.  (*Id*.)

As indicated, Plaintiff filed this lawsuit on May 20, 2016.  In his Complaint, Plaintiff asserts two counts: (I) disability discrimination in violation of Title I of the Americans with Disabilities Act ("ADA") and (II) disability discrimination in violation of Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA").  Plaintiff claims Defendant violated these statutes by failing to accommodate his disability and due to harassment based on his disability.

Defendant seeks summary judgment with respect to Plaintiff's failure to accommodate claims, asserting that it has reasonably accommodated him throughout his employment and he has suffered no adverse employment action, damages, or tangible harm.  Defendant maintains that "[b]y all objective measures,

[its] accommodations have been effective.  Plaintiff performs his job well."
(Def.'s Br. in Supp. of Mot. at 1, ECF No. 29 at Pg ID 104.)

Defendant seeks summary judgment with respect to Plaintiff's disability harassment claims, arguing first that Plaintiff failed to administratively exhaust the claim because he only alleged failure to accommodate in his EEOC charge. Defendant contends that Plaintiff's charge neither asserts nor implies a claim of harassment, and the EEOC did not investigate such a claim.  Alternatively, Defendant contends that Plaintiff's harassment claims fail as a matter of law because he cannot establish the claims' elements.

## II.     Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

14

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## III.  Applicable Law and Analysis

### A.  Failure to Accommodate

The ADA and PWDCRA require an employer to provide a reasonable accommodation to an employee's known disability unless the accommodation would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A);

Mich. Comp. Laws § 37.1102(2).  The PWDCRA " 'substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim.'"  *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002)).  As the parties do not identify a difference in the two statutes that is relevant to the evaluation of Plaintiff's claims, the Court will focus on Plaintiff's ADA claim.

A plaintiff asserting a failure to accommodate claim under the ADA has the initial burden of showing that he has a disability and is able to perform essential functions of his job with or without a reasonable accommodation.  *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014).  Next, the plaintiff must show that his employer refused to provide an accommodation that "seems reasonable on its face."  *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002).  If the plaintiff makes these showings, the burden shifts to the employer to show that the accommodation would have imposed an "undue hardship" on it.  *Id*. at 402.

Defendant contends that it has provided whatever accommodation Plaintiff requires to successfully perform his job for the last twenty years.  As Defendant explains:

> Plaintiff's job requires minimal communication with others.  When such communication is required, [it] has accommodated Plaintiff by working with him to communicate through text messages, hand-

16

written notes, type-written notes, lip reading, visual aids, written materials, demonstrations, and gestures.

(Def.'s Br. in Supp. of Mot. at 21, ECF No. 29 at Pg ID 124.) Defendant provides that Plaintiff's bench-mate, Stewart, is asked at times to sign or fingerspell to give instructions to ensure Plaintiff understands. (*Id.*) Defendant provides further that it has provided ASL interpreters for all large meetings, trainings, and Town Halls since March 2014—the first time it claims Plaintiff requested such an interpreter. (*Id.*) Despite this, the Court finds a genuine issue of material fact with respect to whether Defendant has, in fact, provided Plaintiff a reasonable accommodation.

First, while Defendant maintains that using written notes, lip reading, other visual aids, and Stewart's assistance have been effective, Plaintiff disagrees. As Plaintiff testified, "Well, they would say, 'No, you can lip read. You can read. You can write.' And that's not a successful form of communication for me." (Def.'s Mot., Ex. 21 at 16, ECF No. 30-1 at Pg ID 228.) With respect to Stewart's signing abilities, Plaintiff provided: "It's minimal. It's very simple sentences. Nothing very elaborate. Just one or two things that would—sometimes I don't understand. Sometimes it's written down. And that's still iffy." (*Id.* at 19, Pg ID 231.) Stewart admitted that he is not fluent at sign language and knows only the basics. (Def.'s Mot., Ex. 25 at 9, ECF No. 30-5 at Pg ID 445.)

Thus, while Otis may have believed that she was able to easily understand Plaintiff's written communication and Plaintiff's co-workers may have felt that

they were able to effectively communicate with Plaintiff using these methods, Plaintiff described situations and instances where he was unable to understand what was being communicated or was unable to effectively express himself or timely ask questions to clarify what he did not understand.  Under these circumstances, as is ordinarily the case, "[t]he reasonableness of [Defendant's] accommodation is … a question of fact."  *Keith v. Cnty. of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013) (citation omitted).

Defendant might respond that "the ADA does not require [it] to be clairvoyant regarding the effectiveness of a modification."  *See EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1112 (9th Cir. 2010) (citing cases).  In fact, Defendant seems to have assumed that Plaintiff could adequately read and understand English and that the only difference between Plaintiff and his co-workers was his inability to hear.  Defendant apparently was unaware that American Sign Language is a different language from English and that Plaintiff's use of written English is poor.  But this is why the ADA requires an informal interactive process "[t]o determine the appropriate reasonable accommodation [for a given employee] …."[6]  29 C.F.R. § 1630.(*o*)(3).  The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  *Id*.  The Sixth

_____

[6] Moreover, it appears that Plaintiff was alerting Defendant to the fact that these accommodations were not adequate and that he needed an interpreter.

Circuit Court of Appeals has described the interactive process as "mandatory", requiring "both parties … to participate in good faith." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (2007) (citations omitted).

Defendant nevertheless maintains that it engaged in the interactive process when Plaintiff first requested an ASL interpreter in March 2014. This brings the Court to its second reason for denying Defendant's request for summary judgment. It finds a genuine issue of material fact with respect to when Plaintiff began requesting an accommodation and when Defendant adequately responded to his request. Taking the evidence in a light most favorable to Plaintiff, as this Court must in deciding Defendant's summary judgment motion, he asked for accommodations well before March 2014. While Plaintiff may have directed most of his requests to his union stewards, Otis herself acknowledged that this was the proper procedure for hourly employees to get their requests to the company. In any event, there is evidence that Plaintiff also directed his requests to supervisors.

Moreover, the Court finds an issue of fact with respect to whether the accommodations afforded Plaintiff after March 2014 were effective. There is no genuine issue of material fact that Plaintiff performed his job well. However, the ADA guarantees individuals reasonable accommodations to perform the "essential functions of [their] position", *as well as* "to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without

disabilities."  29 C.F.R. § 1630.2(*o*)(ii), (iii); *see also* 42 U.S.C. § 12112 (providing that employers shall not discriminate "in regard to job application procedures, the hiring advancement, or discharge of employees, employee compensation, job training, and *other terms, conditions, and privileges of employment*.").

Understanding and participating in mandatory employee meetings and being able to effectively communicate with management and co-workers are "benefits and privileges of employment."  *See Campbell v. Wal-Mart Stores, Inc.*, 272 F. Supp. 2d 1276, 1291 (N.D. Okla. 2003) ("It is logical to conclude that the essential functions of Plaintiff's job encompassed not only Plaintiff's ability to sort hangers and fold clothes, but also her ability, at least on some basic level, to communicate with management and co-workers in order to comprehend the changes occurring around her."); *EEOC v. Life Tech Corp.*, No. WMN-09-2569, 2010 WL 4449365 (D. Md. Nov. 4, 2010) (finding summary judgment in favor of the employer not appropriate where genuine dispute of fact existed as to whether the hearing impaired plaintiff was deprived of benefits and privileges of employment where he could not participate in mandatory meetings in same manner as other employees because a sign language interpreter was not provided); *Majtan v. Weck*, No. 99-718, 2000 WL 1386321, at *7 (E.D. Penn. Sept. 22, 2000) (concluding that "[a] jury could reasonably find that [the] plaintiff was denied enjoyment of equal

privileges and benefits when he was denied an interpreter at various employment-related staff meetings.")  The record reflects that Plaintiff was not provided an interpreter for many management, safety, and staff meetings during his employment and that, as a result, he did not usually understand what was being communicated.

A jury also could find that Defendant violated the ADA by not affording Plaintiff the right to utilize Defendant's complaint procedures for reporting harassment equal to employees whose hearing is not impaired.  Otis testified that after receiving a report that Plaintiff was being bullied by a co-worker she needed to immediately understand the seriousness of the situation and thus there was no time to secure an interpreter.  Nevertheless, this fails to explain why an interpreter was never secured to enable Plaintiff to comfortably explain why he reported being bullied by a co-worker, particularly where he expressly stated that he needed an interpreter.  Once Otis concluded that there was no apparent danger of violence in the workplace, it seems that there was time to secure an interpreter and seek Plaintiff's side of the story.

For these reasons, the Court is denying Defendant summary judgment on Plaintiff's failure to accommodate claim.

## B.    Harassment

## 1.    ADA's Exhaustion Requirement[7]

The ADA mandates that "no action ... shall be brought ... if administrative remedies have not been exhausted."  42 U.S.C. § 6104(e)(2); *see also Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309 (6th Cir. 2000).  The plaintiff's administrative charge must "identify the parties and ... describe generally the action or practices complained of."  29 C.F.R. § 1601.12(b).  In federal court, the plaintiff may present only claims raised in the EEOC charge.

However, "'because [the ADA] is a remedial statute, many courts refuse to narrowly construe the charge where such a construction would preclude a plaintiff from bringing a claim.'"  *Cleveland Branch, NAACP v. City of Parma, OH*, 263 F.3d 513 (6th Cir. 2001) (quoting *Ang. v. Procter & Gamble Co.*, 932 F.2d 540, 546 (6th Cir. 1991)) (brackets omitted).  "Consequently, courts have expanded upon the charge filing requirement to provide that a party's discrimination claim may include claims limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination."  *Id*. (citations and internal quotation marks, brackets, and ellipsis omitted).  Further, where the plaintiff was

---

[7] Exhaustion of administrative remedies is not required under the PWDCRA.  *See Jackson v. City of Flint*, 477 N.W.2d 489, 491 (Mich. Ct. App. 1991); Mich. Comp. Laws §§ 37.1605, .1607 ("This act shall not diminish the right of a person to seek direct and immediate legal or equitable remedies in the courts of this state.").

not represented by counsel when filing the charge, the court must broadly read the charge. *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 832 (6th Cir. 1999).

Even when construed broadly, the Court cannot conclude that Plaintiff raised a harassment claim in his EEOC charge or questionnaire. (*See* Pl.'s Resp., Ex. 3 at PLA208-11, PLA219-23, ECF No. 31-3 at Pg ID 818-20, 828-832.) Plaintiff seems to concede this when stating that it is only the documents he submitted to the EEOC during its investigation, rather than his charge or questionnaire, which allege harassment. (Pl.'s Resp. Br. at 23, ECF No. 31 at Pg ID 513.) Defendant would not have been put on notice that Plaintiff was asserting harassment based on what is described in the six pages of EEOC documents Plaintiff now identifies. (*See id*.) Plaintiff did not relate facts in these six pages that would have prompted the EEOC's investigation into harassment. In fact, nothing suggests that the EEOC investigated anything but Plaintiff's claim of failure to accommodate. (*See id*. at PLA383-84 ECF No. 31-3Pg ID 992-93.)

For these reasons, the Court concludes Plaintiff failed to exhaust his administrative remedies with respect to his ADA harassment claim.

### 2.    Hostile Work Environment under the PWDCRA

The elements of a claim for hostile work environment under Michigan's PWDCRA are as follows: (i) the plaintiff belonged to a protected group; (ii) the plaintiff was subjected to communication or conduct on the basis of the protected

status; (iii) the conduct was unwelcome; (iv) the unwelcome conduct or communication (a) was intended to or in fact did substantially interfere with the plaintiff's employment or (b) created an intimidating, hostile, or offensive work environment; and (v) respondeat superior.  *Mazur v. Wal-Mart Stores, Inc.*, 250 F. App'x 120, 127-128 (6th Cir. 2007); *Downey v. Charlevoix Cnty. Bd. of Road Comm'rs*, 576 N.W.2d 712, 716 (Mich. Ct. App. 1998) (applying elements in a case involving disability discrimination).

"In order to establish a hostile work environment [under the PWDCRA], courts ask 'whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment.'" *Mazur*, 250 F. App'x 128 (quoting *Quinto v. Cross & Peters Co.*, 547 N.W.2d 314, 320 (Mich. 1996)) (additional citation omitted).  When making this determination, a court should examine "all of the circumstances 'including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Hussain v. Highgate Hotels, Inc.*, 126 F. App'x 256, 268 (6th Cir. 2005) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2002)) (internal quotation marks and additional citation omitted).  "'Simple teasing, offhand comments, and

isolated incidents (unless extremely serious)' do not rise to that level." *Id.* (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998)).

In response to Defendant's summary judgment motion, Plaintiff identifies the following conduct to support his harassment claim:

> (a) Supervisor Pat Murph dismissively insisting Plaintiff should read lips and did not need an interpreter. (Def.'s Mot., Ex. 21 at 14-15.)
>
> (b) Other supervisors would do the same, or would "blow him off" and display negative attitudes when he requested accommodations. (*Id.* at 15-16, 67.)
>
> (c) He was yelled at and "shooed away" after requesting an interpreter. (*Id.* at 94-98.)
>
> (c) Griffin observed supervisor Patrice Murff[8] mocking and ridiculing [Plaintiff] behind his back as well. (Pl.'s Resp., Ex. 2.)

(*See* Pl.'s Resp. Br. at 8, ECF No. 31 at Pg ID 498.) There can be no dispute that Plaintiff is deaf, that most of the conduct above was based on his disability, and that the conduct was unwelcome. The more difficult questions are whether Plaintiff presents evidence to satisfy the fourth and fifth elements of his harassment claim—that is, that the conduct was intended to or in fact did substantially interfere with his employment or created an intimidating, hostile, or offensive work environment and respondeat superior. The Court finds it necessary to address only the latter element.

---

[8] The Court assumes this is the same supervisor referred to as Pat Murph throughout Plaintiff's deposition.

For purposes of a hostile work environment claim, the Michigan Supreme

Court has described the respondeat superior requirement as follows:

> "Under the Michigan Civil Rights Act, an employer may avoid
> liability [in a hostile environment case] 'if it adequately investigated
> and took prompt and appropriate remedial action upon notice of the
> alleged hostile work environment. Such prompt and appropriate
> remedial action will permit an employer to avoid liability if the
> plaintiff accuses either a co-worker or a supervisor of [disability]
> harassment. An employer, of course, must have notice of alleged
> harassment before being held liable for not implementing action."
> *Radtke [v. Everett*, 501 N.W.2d 155, 168-69 (Mich. 1993)].

> The bottom line is that, in cases involving a hostile work environment
> claim, a plaintiff must show some fault on the part of the employer.
> That is the essence of *Radtke*'s requirement that a plaintiff prove that
> the employer failed to take prompt and adequate remedial action upon
> notice of the creation of a hostile work environment.

*Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 916 (Mich. 2000) (additional internal

citations omitted).  Stated succinctly, the plaintiff must show "that the employer

had either actual or constructive notice of the hostile work environment and failed

to take prompt and adequate remedial action."  *Betts v. Costco Wholesale Corp.*,

558 F.3d 461, 470 (6th Cir. 2009) (citing *Sheridan v. Forest Hills Pub. Schs.*, 637

N.W.2d 536, 542 (Mich. Ct. App. 2001)).  The Sixth Circuit has defined the notice

required under Michigan law as follows:

> "Actual" notice requires a showing that the employee complained to
> an individual in "higher management," which is defined as a person
> who "possesses the ability to exercise significant influence in the
> decision-making process of hiring, firing, and disciplining the
> offensive employee." [*Sheridan*, 637 N.W.2d] at 542-43.
> "Constructive" notice, on the other hand, requires "showing the

pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Id*. at 542.

*Betts*, 558 F.3d at 470-71.

The record in this case does not reflect that the conduct forming the basis of Plaintiff's harassment claim was ever reported to Defendant or that it was so pervasive Defendant should have been aware of the conduct. While the incident between Plaintiff and Sweatt was reported to management, there is no indication that it was related to Plaintiff's disability. As such, the notice required to demonstrate respondeat superior liability is lacking.

For that reason, the Court is granting summary judgment to Defendant on Plaintiff's PWDCRA harassment claim.

## IV.    Conclusion

In summary, the Court finds a genuine issue of material fact with respect to whether Defendant provided Plaintiff with a reasonable accommodation in satisfaction of the ADA and PWDCRA. Plaintiff failed to exhaust his administrative remedies with respect to his harassment claim as required under the ADA. Thus the Court is dismissing that claim without prejudice. Plaintiff cannot prove all of the requirements to establish Defendant's liability for harassment under the PWDCRA. Therefore the Court is dismissing that claim with prejudice.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (ECF

No. 29) is **GRANTED IN PART AND DENIED IN PART**.

s/ Linda V. Parker     
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 7, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, March 7, 2018, by electronic and/or U.S. First Class mail.

s/ R. Loury        
Case Manager
